UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| STEPHEN BRENNAN, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No. 20-cv-12230-IT |
| | * | |
| IQVIA INC. and JON RESNICK, | * | |
| | * | |
| Defendants. | * | |

MEMORANDUM AND ORDER
March 17, 2021

Plaintiff Stephen Brennan alleges that he was terminated by Defendants IQVIA Inc. and

Jon Resnick (collectively "IQVIA") after performing work that entitled him to a substantial

commission and bonus but before being paid for that work.  He claims that Defendants' failure to

pay him the earned commission and bonus violated the Massachusetts Wage Act (the "Wage

Act"), and that his termination breached the implied covenant of good faith and fair dealing, as

recognized in Fortune v. Nat'l Cash Register Co., 373 Mass. 96, 364 N.E.2d 1251, 1257 (1977).

Defendants have filed a Motion to Dismiss for Failure to State a Claim [#7], arguing that

Plaintiff waived both claims pursuant to a release clause in his severance agreement with IQVIA.

For the reasons set forth below, the court concludes that the release does not constitute a waiver

under Massachusetts law for Plaintiff's Wage Act claim. However, the court does find that

Plaintiff's Fortune claim seeking damages for wrongful termination is waived. Accordingly,

Defendants' Motion to Dismiss is GRANTED IN PART and DENIED IN PART.

I.    FACTUAL BACKGROUND

Plaintiff Stephen Brennan started working for Defendant IQVIA on July 16, 2018.

Compl. ¶ 8 [#6]. Defendant Jon Resnick is the president of IQVIA. Id. ¶ 3. Brennan's position at

the company was "Senior Director of Business Development" within the Contract Sales and Medical Solutions team. Id. ¶ 9. He earned an annual base salary of $187,775. Id. ¶ 10.

In June 2019, Brennan began working on a potential business deal between IQVIA and Supernus Pharmaceuticals ("Supernus"). Id. ¶ 12. At the time Brennan began working with Supernus, Brennan's team at IQVIA had not previously done business with Supernus. In November 2019, as a result of Brennan's investment of significant time and effort, Supernus and IQVIA verbally agreed to move forward on a deal worth nearly $30 million. Id. ¶¶ 13–19, 28.

On May 14, 2020, Brennan was notified that he would be "restructured" out of the company and that the termination was not for cause. Id. ¶ 23. Indeed, before his termination, Brennan had not received any written or verbal warnings about his performance at the company. Id. ¶¶ 24–25.

At the time of his termination, Brennan entered into a Severance Agreement [#8-1] with IQVIA. The Severance Agreement, which is stylized as part of the "IQVIA Employee Protection Plan," begins with the explanation that the employee is "being offered payments and benefits as part of the IQVIA Employee Protection Plan ("Plan") that [he] would otherwise not have been entitled to receive." Agreement at 1 [#8-1]. More specifically, the Agreement provided Brennan with $28,888.46 in "severance pay" and a continuance of his health insurance benefits through July 26, 2020. Id. at 4.

In return, the Agreement required Brennan to comply with a list of "Employee Obligations" set forth in an appendix. These include requirements that Brennan continue to cooperate in the transition following his termination, that Brennan maintain confidentiality and return any and all IQVIA materials, that Brennan agree to limit any solicitation of IQVIA

customers, suppliers, and employees, and that Brennan also agree to limit his competition with

IQVIA going forward. Id. at 7–8. In addition, the Agreement included a "Release" that provides:

> Release. Employee, for Employee, Employee's family, representatives, successors and assigns, subject to the terms of Paragraph 5 of this Appendix I, releases and forever discharges the Company and its successors, assigns, subsidiaries, affiliates, directors, officers, employees, attorneys, agents and trustees or administrators of any Company plan from any and all claims, demands, debts, damages, injuries, actions or rights of action of any nature whatsoever, whether known or unknown, which Employee had, now has or may have against the Company, its successors, assigns, subsidiaries, affiliates, directors, officers, employees, attorneys, agents and trustees or administrators of any Company plan, from the beginning of Employee's employment to and including the date of this Agreement, relating to or arising out of Employee's employment with the Company or the termination of such employment other than a claim with respect to a vested right Employee may have to receive benefits under any plan maintained by the Company. Employee represents that Employee has not filed any action, complaint, charge, grievance or arbitration against the Company or any of its successors, assigns, subsidiaries, affiliates, directors, officers, employees, attorneys, agents and trustees or administrators of any Company plan. If Employee has worked or is working in California, Employee expressly agrees to waive the protection of section 1542 of the California Civil Code because Employee is releasing claims, whether known or unknown. Section 1542 of the California Civil Code states: "A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him/her must have materially affected his or her settlement with the debtor." By agreeing to waive the protection of section 1542, Employee expressly acknowledges this Paragraph includes the release of claims which Employee does not know or suspect to exist at the time of this Agreement.

Id. at 5.[1] The Agreement also includes a "Covenant Not to Sue," which provides in whole part:

> Covenant Not to Sue. Employee covenants that neither Employee, nor any of Employee's respective heirs, representatives, successors or assigns, subject to the terms of Paragraph 5 of this Appendix I, will commence, prosecute or cause to be commenced or prosecuted against the Company or any of its successors, assigns, subsidiaries, affiliates, directors, officers, employees, attorneys, agents and trustees or administrators of any Company plan, any action or other proceeding based upon any claims, demands, causes of action, obligations, damages or liabilities which are being released by this Agreement, nor will Employee seek to challenge the validity of this Agreement, except that this covenant not to sue does

---

[1] Paragraph 5 of Appendix I of the Agreement excludes from the release filing or participation in certain actions and seeking non-monetary relief with respect to such claims. Id.

3

not affect Employee's future right to (i) enforce appropriately the terms of this Agreement in a court of competent jurisdiction or (ii) receive compensation related to a whistleblower claim filed with the Securities and Exchange Commission. To the extent Employee receives any monetary relief in connection with any charge, action, investigation or proceeding except as permitted in the previous sentence, the Company will be entitled to offset such amounts against the benefits provided pursuant to this Agreement, to the fullest extent permitted by law.

Id. at 6. Finally, the Agreement included a section where Brennan made certain

acknowledgments about the Agreement and what rights he was forfeiting:

> Employee Review and Acknowledgements; Revocation Period. Employee acknowledges that (a) Employee has been advised to consult with an attorney at Employee's own expense before executing this Agreement and that Employee has been advised by an attorney or has knowingly waived Employee's right to do so, (b) Employee has had a period of at least forty-five (45) days within which to consider this Agreement, (c) Employee has a period of seven (7) days from the date that Employee signs this Agreement within which to revoke it and that this Agreement will not become effective or enforceable until the expiration of this seven (7) day revocation period, (d) Employee fully understands the terms and contents of this Agreement and freely, voluntarily, knowingly and without coercion enters into this Agreement, and (e) Employee is receiving greater consideration hereunder than Employee would receive had Employee not signed this Agreement and that the consideration hereunder is given in exchange for all of the provisions hereof. Employee acknowledges further that the waiver or release by Employee of rights or claims for (i) monetary damages Employee may have under Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act of 1967, the Older Workers Benefit Protection Act, the Americans with Disabilities Act, and the Rehabilitation Act and (ii) any and all rights or claims Employee may have under the Employee Retirement Income Security Act of 1974, the Fair Labor Standards Act, the Worker Adjustment and Retraining Act (all as amended) and/or any other local, state or federal law dealing with fair employment practice laws, wage and hour laws, or the termination of employment, is knowing and voluntary and, accordingly, that it shall be a breach of this Agreement to institute any action or to recover any damages that would be in conflict with or contrary to this acknowledgment or the releases Employee has granted hereunder. Employee understands and agrees that the Company's payment of money and other benefits to Employee and Employee's signing of this Agreement does not in any way indicate that Employee has any viable claims against the Company or that the Company admits any liability whatsoever.

Id.

Shortly following Brennan's termination, IQVIA closed on the Supernus deal. Compl. ¶ 28 [#6]. Brennan alleges that under the terms of his employment, he is owed a commission of $169,950 and a bonus of $5,000. Id. ¶¶ 29–31. IQVIA claims that it no longer has to pay Brennan the commission and bonus at issue. Id. ¶ 32.

Although IQVIA told Brennan he was being terminated due to "restructuring," there is no indication that IQVIA actually performed a restructuring and, in fact, IQVIA ultimately hired another person to fill Brennan's same position. Id. ¶¶ 33–34.

## II.   LEGAL STANDARD

To survive a motion to dismiss, the well-pleaded facts in Plaintiff's complaint must "state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). In reviewing a complaint under a Fed. R. Civ. P. 12 motion to dismiss, the court "must distinguish 'the complaint's factual allegations (which must be accepted as true) from its conclusory legal allegations (which need not be credited).'" García-Catalán v. United States, 734 F.3d 100, 103 (1st Cir. 2013) (quoting Morales-Cruz v. Univ. of P.R., 676 F.3d 220, 224 (1st Cir. 2012)). The plausible factual allegations, taken as true, must ultimately be able to support the legal conclusion that underlies each claim for relief. See Haley v. City of Boston, 657 F.3d 39, 46 (1st Cir. 2011).

Although the court ordinarily only considers the complaint's plausible factual allegations on a motion to dismiss, the First Circuit has recognized a narrow exception to this rule for "documents the authenticity of which are not disputed by the parties; for official public records; for documents central to plaintiffs' claim; or for documents sufficiently referred to in the complaint." Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993). Here, Defendants have attached to their motion to dismiss a copy of the Severance Agreement [#8-1] ("Agreement") entered

between Brennan and IQVIA. Plaintiff does not contest the authenticity of the document nor does he demand that the court convert Defendants' motion into a motion for summary judgment. Accordingly, the court considers the Agreement for the purposes of resolving the sufficiency of the pleadings.

III.   DISCUSSION

The central question presented by Defendants' motion is whether the release contained in the Severance Agreement constitutes a waiver of Plaintiff's claims. As a general matter, the Massachusetts Supreme Judicial Court ("SJC") has stated a policy in favor of the enforcement of releases. See Sharon v. City of Newton, 437 Mass. 99, 105, 769 N.E.2d 738, 744 (2002). Under this policy, "broad wording in the release operates to settle all other, unrelated matters, even if they were not specifically in the parties' minds at the time the release was executed." Eck v. Godbout, 444 Mass. 724, 728, 831 N.E.2d 296 (2005). The parties do not dispute that the release between Brennan and IQVIA was intended to constitute a general release of all claims, known and unknown, between the two parties that existed at the time of the release.

Nonetheless, the Massachusetts Legislature has deemed that employees cannot contract away their right to wages. Namely, the Massachusetts Wage Act provides:

> Every person having employees in his service shall pay weekly or bi-weekly each such employee the wages earned by him to within six days of the termination of the pay period during which the wages were earned if employed for five or six days in a calendar week . . . . and any employee discharged from such employment shall be paid in full on the day of his discharge . . . .
>
> This section shall apply, so far as apt, to the payment of commissions when the amount of such commissions, less allowable or authorized deductions, has been definitely determined and has become due and payable to such employee, and commissions so determined and due such employees shall be subject to the provisions of section one hundred and fifty . . . .
>
> No person shall by a special contract with an employee or by any other means exempt himself from this section or from section one hundred and fifty . . . .

Mass. Gen. Laws ch. 149, § 148.[2] The SJC has interpreted this provision to "generally prohibit an employer from deducting, or withholding payment of, any earned wages" and that any such withholding of earned wages "cannot be overcome by an employee's assent, both because § 148 makes the 'special contract' prohibition unconditional and for reasons of public policy." Camara v. Attorney Gen., 458 Mass. 756, 760, 941 N.E.2d 1118 (2011). Put differently, the Massachusetts Legislature has expressed a public policy for individuals to be paid the wages and commissions they are owed, and to seek redress where needed, even where they agree to forgo this compensation.

In Crocker v. Townsend Oil Co., the SJC confronted the "stark contrast" between the Wage Act's provision prohibiting employees from waiving their rights to unpaid wages and the SJC's long-standing "policy concerning the broad enforceability of general releases." 464 Mass. 1, 12, 979 N.E.2d 1077, 1086 (2012). There, the defendant-employer argued that a general release contained in a termination agreement with the plaintiff-employee constituted a waiver of any claim for unpaid wages under the Wage Act. The SJC rejected the defendant's argument, finding that it would require "indorsing the view that the strong protections afforded by the Wage Act could be unknowingly frittered away under the cover of a general release in an employer-employee termination agreement." Id. at 14. At the same time, the court recognized the benefits of employees and employers reaching a compromise on employment claims. Id. Balancing these competing interests, the SJC ruled that any release of Wage Act claims must be "in clear and unmistakable terms" and must "specifically refer to the rights and claims under the Wage Act that the employee is waiving." Id. These requirements, the Supreme Judicial Court

---

[2] Section 150, in turn, provides for an aggrieved employee's filing of a complaint with the Attorney General, and thereafter, a civil action for lost wages and benefits. Id. § 150.

noted, would allow parties "to settle employment claims by compromising or forgoing a Wage Act claim where that is the intention of all parties." Id.

Here, the Severance Agreement indicates that it was the parties' intention to enter a general release as part of a form termination agreement, not to settle a dispute as to any rights Brennan held to earned but unpaid commissions or bonuses. Indeed, the Agreement saliently makes no mention of any possible claim to unpaid commissions or bonuses. To the contrary, the Agreement includes statements suggesting that the parties did not conceive of any claim to unpaid wages when they entered the Agreement. See Agreement at 1 [#8-1] (noting that the Severance Agreement was providing Plaintiff "payments and benefits . . . that [he] would otherwise not have been entitled to receive"); Id. at 6 (noting that "Employee is receiving greater consideration hereunder than Employee would receive had Employee not signed this Agreement"). The omission of any reference to Brennan's allegedly unpaid wages or commissions suggests that the Severance Agreement was a standard form agreement offered by Defendants to employees separating from the company, not an agreement reached to settle a dispute between Brennan and IQVIA as to unpaid wages.

Defendants argue that the provision of the Agreement stating that Plaintiff was releasing claims under any "local, state or federal law dealing with fair employment practice laws, [and] wage and hour laws" constitutes a sufficient basis for concluding that the parties intended to reach an agreement as to Plaintiff's Wage Act claim. Defs.' Mem. 8–9 [#8]. In support of their argument, Defendants rely heavily on MacLean v. TD Bank, N.A., No. 14-cv-40038, 2014 WL 3530813, at *4 (D. Mass. July 14, 2014) for the proposition that a reference to state and local wage and hour laws is sufficient to constitute a waiver under Crocker. Defs.' Mem. 9–10 [#8]. But although the MacLean court found that the employee had released claims to unpaid wages

8

even though the termination agreement did not cite the Wage Act by name, it did not reach this conclusion on the basis of a passing reference to state and local wage and hour laws in a general release. Instead, the MacLean court found that Crocker's requirements were satisfied where the parties had, prior to the agreement, disagreed as to the employee's rights to certain unpaid "Paid Time Off" and then reached an agreement where the employer paid the employee a sum certain "in complete satisfaction of any and all claims for severance pay, bonus pay, incentive pay or any other compensation or benefits to which [he] is or may claim to be entitled." MacLean, 2014 WL 3530813, at *2. Based on these circumstances, the court concluded that the plaintiff had not "unwittingly" waived his rights to be paid wages. Id. at 4.

The facts here are materially different. There is no suggestion from in the Agreement that there was any dispute between the parties as to unpaid commissions and/or bonuses nor that the Severance Agreement was intended to resolve that dispute. Indeed, even a specific reference to the Wage Act would not necessarily change the equation insofar as the ultimate analysis is not whether the release mentions the Wage Act by name but whether it "specifically refer[s] to the rights and claims under the Wage Act that the employee is waiving." Crocker, 464 Mass. at 14–15, 979 N.E.2d at 1087 (emphasis added). The court does not read Crocker to simply demand a passing reference to the title of the Act, but "clear and unmistakable" reference to the specific rights and claims being forfeited so as to indicate that the employee understood what he was giving up by signing the agreement. Because the agreement here fails to include such express language, the Wage Act claim is not waived.

That leaves Plaintiff's Fortune claim in which Plaintiff asserts that the reason for his termination was to cut off his commission, such that the termination itself amounts to a breach of contract and breach of the covenant of good faith and fair dealing, and "is considered a wrongful

termination." <u>Quesnel v. Prudential Ins. Co.</u>, 66 F.3d 8, 10 (1st Cir. 1995) (citing <u>Fortune</u>, 373 Mass. at 104–05; 364 N.E.2d 1251).[3] Plaintiff seeks as a remedy for the allegedly wrongful termination lost future wages and benefits, not limited to the unpaid commissions and bonus allegedly due for his past work. <u>See</u> Compl. ¶¶ 36, 45, 52 [#6]; <u>see also</u> <u>Maddaloni v. W. Mass. Bus Lines, Inc.</u>, 12 Mass. App. Ct. 236, 249, 422 N.E.2d 1379, 1387 (1981), <u>aff'd</u>, 386 Mass. 877, 438 N.E.2d 351 (1982) (holding that damages under <u>Fortune</u> are "not confined to commissions" but instead include remedies available for breach of employment contracts generally).

However, to the extent that Plaintiff seeks to assert a claim for wrongful termination in violation of an employment agreement under <u>Fortune</u>, that broader claim is waived by the general release contained in Plaintiff's Severance Agreement.[4]  As an initial matter, where <u>Crocker</u>'s heightened-scrutiny analysis for releases of Wage Act claims arises out of statutory provisions contained in the Wage Act, and expressly limited to the Wage Act, Plaintiff points to no similar authority concerning a <u>Fortune</u> claim. More importantly, even if the court were to apply <u>Crocker</u>'s heightened scrutiny analysis to the Severance Agreement here, the court would reach the conclusion that the Severance Agreement constituted a clear an unmistakable waiver of any claim for wrongful termination. <u>See</u> Agreement at 5 [#8-1] ("Employee . . . releases and forever discharges the Company . . . from any and all claims . . . from the beginning of

---

[3] Plaintiff divides his <u>Fortune</u> claim into one claim for "Breach of Contract" and another for "Breach of the Covenant of Good Faith and Fair Dealing." <u>See</u> Compl. 5–6 [#6]. In his pleadings and at the hearing on this motion, Plaintiff acknowledged that the two different claims constitute a single claim under <u>Fortune</u>. <u>See</u> Pl.'s Opp'n 8 [#12] ("Counts One and Two aver essentially the same claim").

[4] The court does not understand Plaintiff's <u>Fortune</u> claim to be a claim for "the agreed worth of . . an employee's past service" under <u>Gram v. Liberty Mut. Ins. Co.</u>, 384 Mass. 659, 429 N.E.2d 21 (1981).

Employee's employment to and including the date of this Agreement, relating to or arising out of Employee's employment with the Company or the termination of such employment . . ."). Accordingly, Plaintiff's <u>Fortune</u> claim based on his allegedly wrongful termination is subject to dismissal.

IV.    <u>CONCLUSION</u>

For the reasons set forth above, Defendants' <u>Motion to Dismiss for Failure to State a Claim</u> [#7] is hereby DENIED as to Plaintiff's Wage Act claim but GRANTED as to Plaintiff's <u>Fortune</u> claim seeking remedies for wrongful termination.

IT IS SO ORDERED.

Date:  March 17, 2021                              /s/ Indira Talwani____
                                                            United States District Judge

11